Good morning, your honors. Joel Pfeffer for the appellant. May you please escort. I would assume a hypothetical situation. We have the same facts here, the same material misrepresentations, but Thane is already a public company. So instead of these material misrepresentations being made in a registration statement, they're made in a press release or a periodic report. Plaintiff brings a securities fraud action. Plaintiff survives a motion to dismiss, which may be a stretch. Plaintiff seeks class certification. I can assure you the first words out of my brother's mouth would be, no predominance, because reliance is an issue, an individual issue. We can't have the thought on the market theory presume reliance because the market is inefficient. Regrettably, the plaintiff would lose. Now have we reached the point where market mechanisms are dependent on whose ox is gored? I think not. More importantly, the 12 trading days or whatever it is, 16 or 17, 12 trading days with the 19 calendar days, 19 calendar days is enough time for the impounding of the disclosure that the listing was to occur on the NASDAQ, the National Market System, whereas in fact it did not. Isn't that the heart of this matter? That's really a subsidiary question. This is a question of the efficiency of the stock. It's the efficiency of the market for the particular stock. It has nothing to do with where the stock trades. You can have stock trade on the New York Stock Exchange and trade inefficiently, and you can have stock trade on the bulletin board and trade very efficiently. It depends on the volume, the number of market makers, the arbitrageurs, essentially the camera factors. So if that's true, if this is a zero-efficient market, then any adverse earnings statements under your representation would have no impact whatsoever on the price of the stock. It may or may not. If it had impact, and it could very well have impact. You said zero, counsel. Zero means that no external factor. I'm not sure what a zero-efficient market would look like, but it has to be that dramatic fall in earnings. It can't have any impact. Well, what a zero-efficient market would look like is that if any of us had $25,000, we can assure what the price would be posted at the end of the day. Now, the first 12 trading days, there was no volume, virtually no volume, maybe a couple thousand shares a day. When the earnings statement came out, there was higher volume, I think. At some point, there were many more market makers. The particular period in which the district court focused, as this court pointed out in its first decision, there was only one market maker, which is the, which does not equal efficiency or even come close to equaling efficiency. But the price drops precipitously after the bad earnings report came out. That was after the first 19 days. It drops when the... But that's the point, isn't it? Well, it could drop for any reason or no reason at all. That's what the defendant's expert testified to. You don't know, you don't know, look, you know, anybody will know where the stock is trading. It's no secret. It's public information. The question is whether the market has the mechanisms to translate information into price accurately. And the court, every court to rule on this issue has ruled that you need an efficient market to be assured that that happens. Is that true? I come from the Second Circuit, and I looked at the Ackerman case, and that doesn't seem to support what you just said. Well, the Ackerman case, which we deal with extensively in the briefs, as I'm sure Your Honor is aware, in that case, and that was Judge Sofair's decision in the district court, it was affirmed, I don't know whether we're talking about the district court or the Second Circuit at this point. Or about the Second Circuit. The Second Circuit first pointed out that as a matter of law, there could not be damages because the, it was a Section 11E case, and under Section 11, under Section 11, the computation of damages. But as I read Ackerman at pages 341 to 342, the court relied on stock price evidence without assessing market efficiency in order to affirm an award of summary judgment to the defendants on account of the affirmative loss causation. First of all, the period during which the prices were reviewed were, I believe, two or three months. The Second Circuit, if I recall correctly, and now that I'm an old man, I find the things I remember best never really happen. Well, we share that in common. If I recall correctly, the Second Circuit specifically said that it gave great weight to the fact that the district court found the misrepresentations were material only as a theoretic matter, theoretical matter. But it did recognize that the stock traded in a thin market in that case. The district court raised the issue sui spontane, and it was really before the development of the efficient market theory legally. I'm not so sure about that. Excuse me? I'm not so sure that's correct. Go ahead. It was, I believe, a month or two within about the same time that Tammer was decided, although I could be, I usually am incorrect. In arriving, this court, the first time around, in arriving at its finding that no part of the 6% stock drop price resulted from what this court already found to be material misrepresentations. Is that what we said? I thought we said we got to send it back to the district court to make that determination. The first determination, the court was dealing with the issue of, this court was dealing with the issue of materiality. Right. And we said, and we reversed the district court and said, no, it is material. But then we sent it back to the district court to conduct the further proceedings on loss costs. That's correct, because this court said that it's not going to decide the issue initially. It does directly raise the issue that the court resolved adversely to you that there is a correlation between the earnings report and no correlation between the failure to accept the reasoning of this court on the issue of materiality, which is relevant to loss causation, was that national, well, among the many reasons, national market system listing lowest costs, which would increase a corporation's profitability. National market system listing decreases spreads, which gives investors better prices. That also directly implicates loss causation. And most importantly, over-the-counter bulletin board listing reduces the demand for a stock by reducing the available pool of investors for at least two reasons. The first reason is that institutions generally do not, they shy away from these stocks. And institutions by now must control over 50 percent of the equity market. The second reason is these stocks are not marginable and many investors will not buy a stock unless they buy it on margin. Each of these reasons enumerated by this court directly impacts the price of the stock. If it directly impacts the price of the stock, it has to be relevant to loss causation. The history of this whole area, this addition of 12B to the statute started with the October 1987 market break, when essentially over a long weekend, the stock market lost about 25 percent of its value. And the Congress, and at least the commentators at the time, they were thinking macro. They were thinking, is it fair for an issuer to insure its investors against these kind of significant events? Now, when this court sent it back, sent this case back to the district court, it was thinking, I am sure, that there may be evidence of significant market events at this time, or the industry could have been going the way of the village blacksmith, or there could have been some sort of physical destruction of plant, property, or equipment. But there was none of that evidence in the record, absolutely nothing. The defendants put all of their eggs in the price, stock price basket. And in this court's first decision, it eviscerated that idea that the price of the stock could be relevant. So it's not relevant at all, as to whether or not the industry is going the way of the village blacksmith? No, no, that would have been relevant, possibly. But there was no evidence of that. Well, that's why we sent it back to the district court, to say, okay, on the assumption, or now we're telling you, that this was a material misrepresentation, conduct a factual determination on loss costs. The district court did not, well, the district court repeated verbatim what it said about materiality, just changed the term materiality to loss causation. They are separate concepts, but they're closely related. Very closely related. Very closely related. So what's wrong with the district court looking at some of the same factors as the loss causation that it looked at? Because this court had already found, as a matter of law, that the price of this company's stock did not represent what an efficient market would price the stock, or would not necessarily represent what an efficient market, and you cannot rely on the price of the stock. It's not an uncommon concept. For example, defendant's expert in a case that, this is a strange case. I'm really arguing the position that most defendants argue, and the defendants are really arguing the position that most plaintiffs argue. How does it feel? Huh? How does it feel? If I got paid every month, it would feel a lot better. So the defendant's expert was a real defendant's expert, and we knew that if we could find his testimony on efficient market, it would support us. But on his deposition, he said he never testified. Right before trial, we located testimony, and that was in the Freshfields case in Delaware, where he said that it was OK for Ron Perlman to purchase stock that was trading on the New York Stock Exchange, well, the courts of corporation in control, to purchase stock that was trading on the New York Stock Exchange at $3.70 for $17.75. If that is not completely disregarding the price of the stock, I don't know what is. And that was a New York Stock Exchange company. Of course, again, it's not the venue, it's the particular market for the stock. And I would like to reserve a rebuttal, unless the Court has any. You may do so, Counsel. Thank you very much. We'll hear from the other side. Good morning, Your Honors. May it please the Court. I'm Daniel Taikode, Counsel for the Defendants. This should be a straightforward affirmance of an eminently plausible factual determination by a careful district court judge, sitting as the trier of fact on the issue of whether Thain's failure to list immediately on the NASDAQ National Market System caused the price to fall below the consideration paid by reliant shareholders, and thus whether plaintiffs suffered any damages under Section 1282 of the 33 Act. The district court weighed all the factual evidence before it. It was largely a battle of experts that occurred there, and based upon all the evidence that included that the stock had, in fact, impounded into the price the fact that it was not listed on the National Market System. And the Court pointed to a number of factors, all of which go to the proposition that the stock did impound information, such as the fact that the stock tracked the NASDAQ National Except when the company produced company-specific information, such as the bad earnings release, that caused there to be a decline in the price of the stock. So looking at that, and looking, for example, with the August 14th release, where within 72 hours of the release of information, where our earnings declined 46% and the stock price then declined 46%, one could have relatively good confidence in the fact that this was a stock that was impounding information into the price. Based upon that, and based upon other factors, such as the fact that the academic literature presents the proposition that listing on one exchange versus another is relatively minor, is of less than 1% benefit, something that occurs in 60% of the cases and doesn't occur in the other 40%. Counsel, would you address the Kammer argument and also relate it to Ackerman and tell us how close Ackerman is to this case? Yes, John. Let's start with Kammer. And let's start with, maybe best place to put Kammer is in the proposition of what the plaintiff is really asking you to do. What the plaintiff is asking this Court to do is to create a rule of law that would hold for the first time that in a less than Kammer efficient market, prices are per se, as a matter of law, legally irrelevant to the assessment of law's causation. That is, I submit the only way that this Court can rule in favor of the plaintiffs, because everything else is just a reasoned decision of a district court judge sitting as the trier of fact under 52A6, I think it's a relatively easy affirmance. So what we really have to do in order to grant judgment for the plaintiffs in this case is create this rule of law, or say that it exists in some other area, say that it exists in some other fashion. So if you look at Kammer itself, it's interesting that we go back and read these cases that we cite all the time. If you look at the facts of Kammer, they're actually in some ways similar to this case. And what the district court did in Kammer is actually a rejection of the approach that this Court took. Kammer featured the defendants arguing that the plaintiffs were not entitled to the presumption of reliance in a fraud on the market case because the stock in Kammer traded on the NASDAQ National Market System. The defendants' argument was this wasn't an exchange like the New York Stock Exchange. And the comments that the defendants made regarding the NASDAQ National Market System in Kammer were very similar to the comments that plaintiffs' expert made about the NASDAQ over-the-counter market in this case, a cowboy market, things of that nature. Kammer rejects a per se rule of law analysis as to what the market is, and instead looks at the facts and circumstances of the case. And what we now know as the five Kammer factors, if we go back to Kammer itself, every time or nearly every time that the Court is expressing that in Kammer, it is saying things along the lines, it would be helpful if, it would be helpful if the company filed an S-3. Saying that the facts in this case meet the Kammer test or that Kammer isn't... No, what I'm saying is that Kammer isn't particularly relevant except for the fact that Kammer says you need to look at the facts and circumstances, which is what the District Court judge did here. The District Court judge's duty in this case was not to ascertain whether or not this stock was efficient under a fraud on the market case pursuant to the Kammer criteria. The District Court's job in this case was to ascertain whether this stock had incorporated into its price the one particular bit of information that was misrepresented in the prospectus, namely the immediacy of listing. Didn't Kammer deal with loss causation? Excuse me, sir. Didn't Kammer deal with loss causation? Kammer dealt with, Kammer was dealing with the, not really, no, Kammer was a case that dealt with class certification standards and whether or not, whether or not the stock had sufficient elements of efficiency so that you could grant or not grant certification. Loss causation was not the underlying issue in Kammer, right? Correct, correct, Your Honor. Now, as to Ackerman, Ackerman, the facts of Ackerman are virtually identical to our case. You have a thinly traded stock. You had a stock where after the adverse information was released, the stock price went up. You had an extreme delay in any reaction. You had expert testimony that, where the District Court judge sat and weighed the plaintiff's expert and weighed the defendant's expert and determined, under the facts of the case, that the defendant's experts were more credible. And you had the Second Circuit affirming that reasonable District Court finding as to the impoundment of information for a stock which clearly was not trading in an efficient market. The Court, as far as the prior panel's decision and the prior ruling, that decision was not fair, determined that, in light of what it called undisputed objective benefits, that the misrepresentation that it found in the prospectus was material as a matter of law and did so pursuant to TSE industries. Now, we actually have some problems with that opinion. I think it is inconsistent with TSE itself and it's inconsistent with BASIC, and it also is inconsistent with the approach taken in America West. Nevertheless, we are not asking you to overrule that decision, although you actually could. It is law of the case, but law of the case, and again, I don't want to get things too mixed up here, because I think that it's an easy affirmance, 52A6, in light of the factual determination of the District Court, and you do not have to reassess the materiality decision of that prior panel. But if you take a look at cases such as Tahoe-Sierra Preservation Council versus Tahoe Regional Planning Agency, 216 F. 3rd, 764, a 2002 case decided by this Court. Is this a brief? No, it is not, Your Honor. You may have heard me say this before. I understand. Please give the Deputy Clerk a tripod. We will do so. We will do so. Or U.S. versus Cuddy, 147 F. 3rd, 1111, 9th Circuit, 1988, two cases where a subsequent different panel, but within the same case, reversed the prior panel's decision under the law of the case, citing that the law of the case is not immutable, and under a clear error or a manifest injustice standard, we can basically change our minds, notwithstanding the fact that it's two different sets of panels, two different individuals. And there are additional cases such as Jeffries versus Wood, 75 F. 3rd, 491, 9th Circuit, 1996, where the Court held that the doctrine of the law of the case does not relieve us of our duty to correct our own manifest error. So to the narrow question that you asked, Judge Tallman, yes, you do have the power to do so, although, understandably, it's not frequently done. What would be the effect of our reaching that question and deciding it as you propose? Well, let me be clear. First line of argument is you don't have to go there, okay, because you rule that in light of the undisputed, what the Court says, the undisputed objective benefits of a listing on the NMS, the decision not to lock in those benefits immediately was material as a matter of law. That, however, does not mean that that material misstatement caused the loss. And so consistent with the prior panel's decision, and consistent with the fact that the prior panel sent it back down to the District Court for determination, that question on loss causation remained open for the District Court to do. And it is a factual determination. If it were not open for the District Court to make that determination, then remand would have been inappropriate under the cases that we cite in the brief. And if it were not possible to make that determination, then Section 12B would be a nullity because Section 12B contemplates the fact that even though you have a material misstatement under Section 12A.2, there can still be a loss causation defense for a material misrepresentation. And again, the fact that the panel sent it back for determination, the fact that that's simply possible, all of that allows you to rule to simply, as a firmness under a clear error standard for a factual determination, that the District Court's determination was reasonable, it was plausible. If you go to the question that I reserved on a moment ago, namely the materiality question, I would say that you should examine carefully the TSC Industries case, in this case in light of TSC Industries. In TSC, the District Court had refused to grant summary judgment to the plaintiff on what it called a material omission, namely the ability to control the corporation that was at issue. The Seventh Circuit reversed the District Court on this and held that as a matter of fact, that this was material because it might have influenced the decision-makers. The Supreme Court in TSC rejected that might-have standard, and it ruled instead that these were what I call delicate assessments that had to be made by the trier of fact that could only be reversed if no reasonable person could disagree. If you look at what the prior panel did in this case, how it framed the question, it asked whether a misrepresentation that it found the prospectus could be material under the facts in this case, and it held as a matter of law that they could be. Well, just framing it that way really gave you your answer. Of course, it could have been material. If it couldn't have been material, defendants should have been entitled to summary judgment on the issue. But because the trier of fact could have decided that it was material or could have decided that it was immaterial, the issue was left for the trier of fact to make the delicate assessments that the court should have affirmed unless no reasonable person could have concluded otherwise. Well, here we know that lots of reasonable people concluded otherwise. The District Court, sitting at the trier of fact, concluded otherwise in materiality. Was the District Court reasonable? The two named plaintiffs in this case, the two class representatives, each admitted that they knew after they received their shares that they weren't listed on the NMS and they could have sold at a profit, and they didn't sell. Well, that's evidence of what a reasonable person would do. And we had hundreds of shareholders who didn't sell, who didn't rush to the exits, notwithstanding the fact that, even as plaintiffs acknowledge, it was obvious where the stock was traded. If that sort of no reasonable person could decide otherwise standard means anything, it really should have meant something in this case, where you had literally hundreds of reasonable people, including the District Court judge who knew most about this case than anybody, who concluded otherwise. So I think that the way the panel framed the question the last time, namely, could it have is very, very similar to what the Seventh Circuit did in TSC, the whole might have standard. And I think it reached the wrong conclusion on materiality. I think under America West, under Gilead Sciences, under BASIC, it was something that should have been left to the trier of fact and should not have been determined as a matter of law, unless you really could say that no reasonable person could have decided otherwise. And again, I think the evidence is overwhelming that lots of reasonable people decided otherwise. So I think that question on the materiality issue, while this court doesn't have to reach it, I think that if it were to decide to, that it would be something that, as a matter of kind of getting it right, one might consider doing. Because it's really kind of extraordinary. If you look at what happened with the original appellate opinion here, the original appellate opinion said it was wrong for the district court to look at price in a less than fully efficient market. We then briefed it en banc and said, in a sense, look where the Ninth Circuit is going on this. Look what a limb the Ninth Circuit is climbing out to, where are you really holding as a Now, the full circuit did not grant en banc review, but the panel did amend its opinion. And the panel amended its opinion to say, under the circumstances of this case. Thank you, counsel. Your time has expired. Thank you, Your Honor. Mr. Pfeffer, you have some reserve time. Judge Wardlaw's decision was consistent with every single decision I'm aware of on the subject of efficient markets. I think the opposing argument has now crystallized, in effect, what the defendants are asking you and what an affirmance effectively will do is reverse Judge Wardlaw's decision. This case was remanded to see if there was anything in the record, any type of macro evidence in the record. All the district court did is repeat exactly what was said on the issue of materiality but call it lost causation. I was able to locate the Second Circuit decision in Ackerman, and I call this Court's attention to page 341, where the Second Circuit does an excellent job, really, in effect, limiting the district court's decision and really ruling on materiality. It says, we note, however, that the district court held that the misstatement was material only as a, quote, theoretical matter. This conclusion weighs heavily in our judgment. The misstatement resulted from an innocent bookkeeping error, and then it goes on, in the context of the prospectus's pessimistic forecast of the performance of the issuer's subsidiary. I think it's clear the Second Circuit is talking about materiality here. I think if there's an affirmance here, you're going to, and it would not, if there's an affirmance here, you're going to reopen completely the subject of the efficient market hypothesis and you're going to, this decision then will be relied on by every plaintiff's lawyer when the issue of reliance comes up on class certification. I'm over my time, and I thank you for your indulgence, Chief. Thank you very much, Counsel. The case just argued will be submitted for decision. The Court will take a ten-minute recess.
judges: Block, O'scannlain, Tallman